**Exhibit "F"**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ROCKLAND : CIVIL TERM

- - - - - - - - - - - - - - - - - - - - - - - - X

MCCORMICK 105, LLC,

Plaintiff,

-against-

JAMES P. AVARAS, MCCORMICK 105, LLC, "JOHN DOE 1-5" and "JANE DOE 1-5", these names being fictitious and unknown to plaintiff, the persons or parties intended being the tenants, occupants, persons or corporations, if any, having or claiming an interest in or lien upon the premises described in the Complaint,

Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - X

Index No.: 036145/2017

**Order to Show Cause**

Rockland County Courthouse
One South Main Street
New City, New York
November 21, 2022

BEFORE: HONORABLE ROLF M. THORSEN,
Acting Supreme Court Justice

APPEARANCES:

LAW OFFICES OF JEFFREY S. GREENE, P.C.
Attorneys for the Plaintiff
800 Westchester Avenue, N307
Rye Brook, New York 10573
BY: JEFFREY S. GREENE, ESQ.

ZERILLI & ASSOCIATES, P.C.
Attorneys for the Defendants
20 South Main Street, Suite 5
New City, New York 10956
BY: JOSEPH M. BECKER, ESQ.

ALSO PRESENT:
CONNIE AVARAS

IRENE F. MONFREDO
SENIOR COURT REPORTER

THE COURT CLERK: Number 15 on today's calendar in the matter of McCormick 105, LLC against James Avaras. Plaintiff to my left, please, and your appearance for the record, counsel.

MR. GREENE: Good afternoon, Your Honor, Jeff Greene on behalf of the plaintiff, McCormick 105, LLC.

THE COURT: Good afternoon, Mr. Greene.

MR. BECKER: Good morning, Your Honor, Joseph Becker on behalf of the defendant, James Avaras. I also have in the courtroom with me Mr. Avaras' wife, Connie Avaras, as well as his son. Unfortunately due to Mr. Avaras' health, he was unable to be here.

THE COURT: Good afternoon to you all.

So we're here this afternoon pursuant to an Order to Show Cause which Mr. Becker has filed on behalf of the defendants seeking a stay of the foreclosure sale which is scheduled from an hour from now.

Talk to me, Mr. Becker.

MR. BECKER: As stated in my papers, Mr. Avaras is suffering from severe brain cancer. He recently underwent emergency brain surgery. He's had multiple surgeries. In fact, since I believe this past weekend, he was in the hospital again. In short, for him to lose his home at this time would be an extreme hardship.

As the Court is, I'm sure, well aware, foreclosure

actions are equitable in nature. And when equity is involved, it is as broad as equity as justice would require. Now, in many other situations where people may lose their home, equity can intervene to prevent that loss, whether that be evictions or another method that sometimes causes people to lose their homes would be a partition action. In both of those actions, equity can intervene to prevent the loss of a home when it results in extreme hardship. Here, the loss of Mr. Avaras' home would put his health at tremendous risk because of his current medical condition. As such, it is the defendant's belief that equity should again intervene much like it can in other forms, in other cases, to stay the sale and allow Mr. Avaras to retain his home during his current medical situation.

In addition, the Avarases are attempting to work towards a modification and this would buy them time -- give them time to do that. But, whether that modification is ultimately successful or not, the fact remains that the loss of the Avaras' home at this point would be an extreme hardship and unusual hardship. It is not a matter of the ordinary hardship which is severe with the loss of a home, but this goes above and beyond that. Ordinarily when someone loses their home, they lose their home and it's a devastating loss. Here, it risks the life, immediately the life of Mr. Avaras.

THE COURT: So obviously the Court is sympathetic towards Mr. Avaras and his family, as well. Mr. Becker, as you are constrained to do based upon the medical information provided to the Court makes reference to his current medical condition, which is obviously very serious, but I don't have any indication as to, you know, how long this stay might be necessary, whether it's a day, a week, a month, a year, two years. I don't have really any information as to his prognosis, if you will, other than that, yes, if he is forced to move at this point in time it would, you know, potentially have a devastating effect on his health and, again, I appreciate that.

MR. BECKER: If I may, Your Honor, Mr. Avaras' wife is here, I believe she has more knowledge about his medical prognosis than I do. So if I may invite her to speak and give an answer to the Court's questions.

THE COURT: Come on up, ma'am.

(Connie Avaras enters the well.)

CONNIE AVARAS: Thank you, Your Honor.

THE COURT: Can I ask you to raise your right hand.

Do you solemnly swear the testimony you're about to give in this proceeding will be the truth, the whole truth, and nothing but the truth?

CONNIE AVARAS: I do.

THE COURT: Please put your hand down. Speak

loudly, tell me your name and spell it.

CONNIE AVARAS: Connie Avaras, C-O-N-N-I-E, A-V-A-R-A-S.

THE COURT: And what's your home address, ma'am.

CONNIE AVARAS: 93 South Mountain Road, New City, New York 10956.

THE COURT: And that's the address of the house in question?

CONNIE AVARAS: Yes, it is.

THE COURT: And you're the husband of James Avaras?

CONNIE AVARAS: I'm the wife.

THE COURT: You're the wife, excuse me, wife of James Avaras.

CONNIE AVARAS: And the husband at this point I guess you could say.

THE COURT: So what can you tell me, ma'am?

CONNIE AVARAS: So what we're trying and hoping to do is we just very recently been able to receive from the bank loss mitigation documentation that we were able to utilize after the COVID hardship. We just -- in fact, we're waiting for one more FedEx packet today which should be received by 8 p.m. according to the tracking number. So we are very hopeful with respect to your concern on the timeline as separate from Jim's prognosis. We're very hopeful with the help of Jim's family that we're going to be

able to save our home.

So, we have a very good plan in place to work through the negotiations of the loss mitigation now. And the bank has just sent the reinstatement letter and the documentation needed, November 18th we just got it, and unfortunately as Mr. Becker has mentioned, we didn't get -- you know, this weekend created another emergency, Jim was discharged at three in the morning on Saturday night and without a catheter, after his emergency surgery this week at Westchester Medical, the fourth in four months, and without a Foley catheter in he wasn't able to void. It was a disastrous error from the hospital. But the point I'm making is we did have another emergency this weekend so we haven't even been able to fill out the loss mitigation papers.

THE COURT: Ma'am, right now the last thing I'm concerned about is a potential modification. I'm asking about your husband's prognosis based upon what his diagnosis is.

CONNIE AVARAS: We're very hopeful now after this last surgery, the brain surgery that happened a few weeks ago at Columbia, that Jim is finally going to be recovering and getting better. It is the best news we've had in a long, long while. His shunt was not working for ten years, they discovered that at Valley Hospital, did emergency

surgery at Columbia a few weeks ago, replaced his shunt. He's talking for the first time in months. He's taking steps for the first time in months. And now with the recent surgery on his prostate and his kidney infection and all that at Westchester Medical this past week, he's even now beginning to -- we removed the Foley catheter and he's going to start urinating. Everything is coming back.

THE COURT: So he's had a shunt for ten years so this is not a recent affliction? He's had issues for at least ten years?

CONNIE AVARAS: He's had issues since 1993 with the initial brain tumor and radiation in the nineties causing the TBI, that didn't stop him from working and being able to handle everything until 2017. He then had emergency brain surgery in 2019, the second brain surgery, and now he's had a third just now last month or a few weeks ago.

So, unfortunately with the shunt not functioning and us just learning that, he lost a great deal of his ability, which is really a tragedy that didn't have to happen, and he lost a lot of his speech and ability to walk and talk and do everything. At this point he is bedridden, but with the shunt repair, which is miraculous, he had a two-hour recovery at Columbia -- I mean a two-week recovery of nonresponsiveness, but he came out of it and is recovering now. So, we've been more hopeful right now than

we've literally been in years, and we do have a plan to move forward with how we can get back on track and recover the home.

MR. BECKER: So, do you have any sort of timeline with respect to how long until your husband is recovered sufficiently that he can engage in more normal activities and he's not bedridden or housebound?

CONNIE AVARAS: It's very difficult to say. I mean, we have home nursing and PT and OT now so we're working stridently now and every ability to bring him back cognitively, physically. You know, I wish I knew that answer. What I can say is this is the most hope we've had in a long time, but he's in a terrible state right now and I'm not God.

THE COURT: I'm sorry you're in that predicament, I really am.

Mr. Greene.

MR. GREENE: Your Honor, yes, it sounds like a terribly awful situation and we empathize, but unfortunately, this has been known to this Court, it's actually known to the Bankruptcy Court. When we brought the motion -- there was another firm that was involved, Frankel, Weiner firm before my firm was substituted in, they brought a motion for judgment of foreclosure and sale, Mr. Becker brought up this issue. In fact, one of the letters that he

attaches to the Order to Show Cause is the same one in December of '21 that explains his condition; the Court granted the motion. We then had to bring another motion to get an extension because the 90-day time period had expired under the judgment, that was also opposed and that issue was brought up again, and Your Honor did recognize it. And you said, you know -- you know, you recognized the Court has sympathy with the circumstances here, but unfortunately these aren't legal arguments, you know.

This foreclosure proceeding, the sale that should be held today, is not dispossessing Mr. Avaras. Obviously there's some steps that have to be taken after that. He has -- you know, he may want to raise this in another forum at another time, but this really affects his legal interest. This is an action that's been pending since 2017. You know, they had the Chapter 13 case. They had the chance to reorganize there. And in fact, Judge Morris, Southern District, dismissed the case as bad faith because of the way it was handled and the filings that were done, or the non-filings that were done.

I do understand that there was a request for, you know, the standard loss mitigation package which was done on November 16th, really quite late. Actually, our foreclosure sale was scheduled for November 14th, but our referee had contacted us like two days or three days before saying he

was going to be in London and couldn't make the sale so we adjourned it, we adjourned it for a week. And then, I guess, obviously Mr. Becker's firm was on notice of that, and, you know, they awoke again really with the same arguments they've had.

And, again, it's really a terrible circumstance, but, you know, quite frankly, everybody has terrible circumstances. I have things in my family that people undergo terrible circumstances with cancer and stuff like that, but these are legal obligations. He's had it for a long time and it's been in default and my client is entitled to try to mitigate its losses. They have a foreclosure sale set and it's not going to immediately dispossess Mr. Avaras. If there is some condition that he has that prevents that, he can take it up in a different forum.

I haven't spoken to Mr. Becker about it, but there are circumstances that my client does offer a cash for keys circumstance which we'll actually give them some money to help them move. But again, I don't think that's really the issue today. So, you know, with that, I would ask, you know, that the TRO request be denied.

THE COURT: What about that, Mr. Becker, even if the sale should proceed today, there is a variety of legal steps that would still need to take place if your client did not just voluntarily remove himself from the premises which

could take, as we know, months?

MR. BECKER: I understand that, Your Honor; however, whether the sale goes forward or not, as you mentioned, it could take months for my client to be dispossessed. So why at this point foreclose the option to continue to work with the bank to try to achieve a modification, which a loss of the property would do, especially if it went to a third-party purchaser which could happen? We don't know if anyone is planning to bid, if the bank is planning to bid or anything like that. So it could foreclose any ability to save this property during the time that Mr. Avaras is convalescing.

Additionally, I've been informed by Ms. Avaras that Mr. Avaras' mother is apparently willing to sell her house to try to facilitate saving this property.

Also, just to address a couple of additional points, they mentioned that it was a bad faith bankruptcy filing, and I understand that's what the bankruptcy papers stated, however -- and while I was not involved with the bankruptcy, I'm not admitted federally so I'm not -- I do not have personal knowledge of this, I've been informed that the bankruptcy was originally brought in Florida and then transferred to New York. And then when it was transferred to New York, apparently the firm that was handling it on the Avarases behalf did not appear at a conference or some

matter which resulted in the dismissal, but it was not through the Avarases -- they were allegedly, according to Ms. Avaras, they were not aware of it.

More over, in terms of -- I'd also like to point out that in terms of a stay and whatnot, my clients, if nothing else, are able to cover the taxes and insurance for the property so the bank's position would not necessarily need to be made any worse off, it's just a matter of time. They're not putting more money after this as it were.

THE COURT: Anything else, Mr. Greene?

MR. GREENE: I would -- again, the obvious, Mr. Becker's argument, I would just switch to the financial aspect of it. The financial aspect of this scenario is, you know, unfortunately they really don't have any defenses to that. They've had all this time. This is not new. My client is not a monster. This is not new. They're just trying to -- they have to answer to other people, other investors, and you know, this was actually a contested matter. They wanted discovery. They contested this for a long time. They went through the bankruptcy. You know, it's really a little bit disingenuous to put the health issue related to the financial issue because that's really not on the table. Just applying for a loss mitigation package does not amount to a hill of beans at this point.

So again, the argument that the Court is presented

here with is, you know, his physical condition, his medical condition, and that's not going to be disturbed by today's foreclosure sale, that's for sure. And whatever potential rights he may have with that, to preserve that, maybe prolong it until he can actually leave the premises, that's an issue for another day in another forum.

THE COURT: Well, I will note that the physical condition of Mr. Avaras has been known to the Court for quite some time. And I note that as far back as September 21, 2021 the issue was raised before Court Attorney-Referee David Markus in connection with a hardship exemption and the Court did address Mr. Avaras' condition at that point in time. And, again, as most recently as this Court's order dated September 27th of 2022, the Court specifically stated, quote, this Court empathizes with defendant's medical condition and commends counsel to implement this order with decency. I'm going to try to make this determination with decency, as well.

As indicated, I certainly, again, empathize with what's happening in your household, ma'am, but I think at this point in time --

CONNIE AVARAS: May I?

THE COURT: -- we're not --

CONNIE AVARAS: May I respond?

THE COURT: -- having you and your family vacate

the premises today or tomorrow.

CONNIE AVARAS: That's not the point, Your Honor.

THE COURT: I'm sorry, ma'am?

CONNIE AVARAS: May I respond to one thing? That's not the point about vacating, although it's critical at this juncture, the point is that it will save Jim's life to keep his home. I wrote something for you that I was not able to be --

THE COURT: That's not even out of the question regardless of what happens today, ma'am.

CONNIE AVARAS: And the COVID hardship was what he refers to in 2021.

THE COURT: I understand. Absolutely. That's what I was referring to, as well.

CONNIE AVARAS: That is a different story because in May when that bankruptcy happened Jim was undergoing radiation and chemotherapy on a daily basis. We certainly would have showed up had we known about it. We're not interested in going to bankruptcy. We know that we can work it out with the lender, we are 100 percent confident. So we can start doing that immediately.

So we're not even asking for a long stay here. We're asking to not go through the Bankruptcy Court. We're asking to work directly with the lender which we now have the ability to do. And this is all new since September

27th, since that most recent discussion when, again, Jim was in these emergency surgeries in the last four months. I had no knowledge of the foreclosure even coming through with those documentations and paperwork because we were immersed in saving his life. We have done so and now we are ready with the help of family and friends, we are able to save our home and we want to do so directly with the lender through reinstatement modification, whatever the means may be. We are ready to do so. And losing it --

THE COURT: And I appreciate that, ma'am, but again, I've got to look at this from all sides here. I'm looking at the Summons which initiated this action four years and 11 months ago almost to the day, and I know that you've been represented by counsel throughout this process, Mr. Greene indicated that it has been contested for quite some time now, and I know --

CONNIE AVARAS: We did loss mitigation.

THE COURT: I know Mr. Becker from dealing with him on many cases, and he has done everything within his power to fight for the rights of your husband, and he's here today in one more effort to get this done. I'm not happy that I'm making this decision, ma'am, trust me, I don't feel good about this. I feel anything but good about making this decision.

CONNIE AVARAS: It's not a stall effort. This is

not a stall effort.

THE COURT: I didn't say it was. I know you're doing what you feel is best for your family, ma'am.

CONNIE AVARAS: Even a few weeks, a month, so we could work with them and show them that we have the ability to pay.

THE COURT: I understand, ma'am, and that is always subject to agreement. And if the bank chooses to, you know, cancel the sale, they can do so.

CONNIE AVARAS: We have a tax issue here beyond that, sir. And the other issue is that in 2018, we tried to work with the bank with a full modification and the ability to pay. So when he referenced 2017 as if nothing has been done, we have worked diligently every step of the way and all of our actions have been denied flatly. We tried to short sale to someone that was willing to rent it back to us for the short-term. We tried every possible avenue with the bank and they have not been willing to do so.

So, reinstatement would be what would work at this point since they don't want to seem to do anything else. But we're asking for that period of time, a very short window of time to get this done with the bank, and at that point if you could see that they are not willing to work with it, then we have other choices to make, but we know we can do it, Your Honor. We just need the bank to hear us

now, finally.

We received the papers. We've been asking all month for these documents. So it's not true that we just requested them on November 16th. I've been calling the bank like crazy, as I have from November 2017, 2018. There was even a phone call where they thought we hung up the line and they said, while my husband and I stood there, hat in hands, saying we're ready to move forward with this modification with all the means to do so in 2018, and they said we're going to make a lot of money on this one. They thought we hung up the phone, they were still on, and they were laughing. And they are making a lot of money on this one and it's not right or fair.

MR. GREENE: I don't have a witness here to counter that. I'm not going to cross-examine Ms. Avaras.

THE COURT: As I said, you know --

CONNIE AVARAS: It's money, sir.

THE COURT: -- this is one of the more difficult decisions that I've had to make, but Mr. Becker, I'm going to decline to sign your Order to Show Cause at this time.

MR. BECKER: Understood.

THE COURT: Good luck. Good luck, ma'am.

MR. GREENE: Thank you.

(Certification on next page.)

* * * * *

C E R T I F I C A T I O N

The foregoing is hereby certified to be a true and accurate transcript of the proceedings as transcribed from the stenographic notes.

IRENE F. MONFREDO
Senior Court Reporter